AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
## for the
## Western District of New York

| | |
|---|---|
| United States of America | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL H. WILSON | ) |
| | ) |
| *Defendant* | ) |

Case No. 10 - M - *1070*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning in or about June, 2008, and continuing until on or about July 19, 2010, in the Western District of New York and elsewhere, the above named defendant, having intended to devise and having devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing and attempting to execute the scheme and artifice, did knowingly cause to be transmitted by wire communication in interstate commerce writings, signs, signals, pictures and sounds;  in violation of Title 18, United States Code, Section 1343.

This criminal complaint is based on these facts:

**X**     Continued on the attached affidavit.

_____
*Complainant's signature*

**ALLAN RAINS, Special Agent**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 21, 2010_____

_____
*Judge's signature*

City and State:  Buffalo, New York_____

**JEREMIAH J. McCARTHY, U.S. Magistrate Judge**
*Printed name and title*

## AFFIDAVIT

ALLAN RAINS, being duly sworn, deposes and says:

## INTRODUCTION

1.    I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed for approximately nine years.  I am currently assigned to the Buffalo Field Office and to the White Collar Crime Squad within that office.  My duties include the investigation of such offenses as investment fraud, money laundering, bank fraud, public corruption, corporate fraud, mail fraud, wire fraud and other white collar crimes.

2.    I make this Affidavit in support of an application for a complaint charging MICHAEL H. WILSON with knowingly devising a scheme to defraud and to obtain money by false pretenses and representations, and using interstate wire communications in furtherance of that scheme.

3.    Because this Affidavit is submitted for the purpose of establishing probable cause to support the issuance of a Criminal Complaint, I have not included each and every fact known by the government concerning this investigation.  The facts stated below in the section of this affidavit entitled "Details of The Investigation" will focus upon three investments that victims or

potential victims made with companies controlled by Michael Wilson pursuant to "leveraging agreements" that promised payouts of or access to millions of dollars, within periods of a few months or less, from investments of approximately $250,000 in two cases that occurred in 2008-2009 and in a recent case that appears to be ongoing, an investment of approximately $71,000.

## SUMMARY OF INVESTIGATION

4.   In or about November of 2008 the FBI learned that Michael H. Wilson, then 21 years of age, had purchased two adjacent properties on Boston State Road in Hamburg, New York for more than $6 million.   One was located at 6523 Boston State Road and the other at 6553 Boston State Road.   The property at the 6523 address was a residence.   The property at the 6553 address was used for office space.   Wilson agreed to pay $3 million for the residence and $3.3 million for the office building.   Wilson made approximately $2.5 million in down payments, while the remaining balance on each property was to be paid in semi-annual installments of $500,000, ending in the Fall of 2010, except that the final installment on 6523 Boston State Road was to be in the amount of $300,000.   None of these payments was made, and Wilson ceased to occupy the properties less than a year after he purchased them.

5.     The FBI and the Internal Revenue Service, Criminal Investigations, have learned that Wilson controlled several companies bearing the names listed below or variants of those names.  The undersigned and other agents have spoken to former employees of these companies, who confirmed that they were controlled by Wilson.    The undersigned participated in the execution of search warrants of the Boston State Road properties on July 1, 2009.  During that search, voluminous business records were seized.    Also on July 1, 2009, the undersigned interviewed Michael Wilson, who stated, among other things, that he controlled some of the companies.    The companies have been referred to by various names, including:

New Frontier Holding, LLC
New Frontier Asset Management, LLC
New Frontier Homes, LLC
New Frontier Corp
The New Frontier
New Frontier Placement, LLC
New Frontier Holdings LLC
New Frontier Corp.
New Frontier Corporation
New Frontier Real Estate
New Frontier Homes
New Frontier Holdings Trust
Phantom Holdings One, LLC
Phantom Holdings One
Carnic Services LLC

These companies will at times be referred to collectively in this Affidavit as "New Frontier."

3

6.  The undesigned has reviewed documents showing that several bank accounts were opened in the names of some of the entities listed above or variants of those names.  Some of those accounts are listed on the Table below set forth in paragraph 11 of this affidavit.  Through analysis of account records, the undersigned has learned that Wilson's companies received large deposits of funds into some of these accounts and that the funds then were spent on such things as the properties at 6523 and 6553 Boston State Road, several automobiles (e.g., a Land Rover, a Range Rover, a Hummer, a Corvette, and a Mercedes), and other personal items. The undersigned has reviewed other documents obtained during the investigation, including documents purporting to be investment agreements between investors and Wilson's companies.  Through bank records and contacts with some of the investors or their agents, the undersigned has learned that the money received into bank accounts described herein was obtained by Wilson based upon representations that Wilson's companies would obtain investment instruments for the investors that would produce huge returns on their investments.  Initial investments by investors ordinarily were $250,000 or more.  However, Wilson never invested these funds. Analysis of the bank accounts shows, instead, that the funds received into the accounts were spent on the residence and business properties, automobiles, furnishings, and other personal items.

4

7.   During the investigation the undersigned learned that Rosemary Wilson, Michael Wilson's mother, lived in one of the Boston State Road properties while Michael Wilson and his companies occupied them.   Rosemary Wilson also was the source of a small initial deposit into one of the New Frontier accounts listed in the Table below.   The undersigned also learned that one of Michael Wilson's closest friends, and an employee of his companies, was David Smith.

8.   During the investigation, on July 1, 2009, FBI Special Agents interviewed David Smith.   Smith was born in 1987.   Smith told the FBI, among other things, that he had been employed since January 2009 as the head of operations of New Frontier Holdings LLC at an annual salary of $100,000. Smith said his supervisor was Michael Wilson and that he had been Wilson's friend since they attended the same high school in the Cleveland, Ohio, area.   Smith said generally that he (Smith) did not deal with clients and that he did not understand very much of Wilson's business.   Smith said Wilson and another employee, whom he identified by name, dealt with New Frontier's clients.   Smith said Wilson bought a Corvette automobile as a present for him in the Spring of 2009. Investigators have learned that in 2009 one of the e-mail addresses used by New Frontier was ds981@live.com.

9.   The undersigned also learned from interviews of investors, Wilson's employees, e-mail correspondence involving New Frontier, and other documents seized during the execution of the search warrants, that several persons who tried to contact New Frontier or Michael Wilson were referred to a person purportedly named "George Possiodis" to discuss the status of their investments.  Several persons who were investors with New Frontier, or agents of investors, advised the undersigned during the investigation that they would call New Frontier and ask for George Possiodis, that they had spoken with George Possiodis, or had tried and failed to contact George Possiodis.

10.   The undersigned learned, however, that George Possiodis was a fictitious identity assumed by Michael Wilson and that at least two key employees at New Frontier did not know this.  One New Frontier employee advised the undersigned that the employee heard Michael Wilson pretend to be George Possiodis while receiving a telephone call.  The undersigned has further confirmed that David Smith and Michael Wilson hired an actor to pretend to be George Possiodis for the purpose of meeting the employees of New Frontier and, specifically, to dupe the two key employees referred to above who believed George Possiodis was a real person.  (When interviewed by the FBI on July 1, 2009, David Smith said he never had heard of

a person named George Possiodis, but did not tell agents that this was a fictitious person.)  The undersigned has examined a check for $1,800 paid to the agency hired by Wilson to supply an actor to pose as George Possiodis on or about January 30, 2009.

## DETAILS OF THE INVESTIGATION

11.   Financial accounts involved in Michael Wilson's scheme to defraud include those listed on the Table below.  Wilson caused the accounts listed below to be opened at Edward Jones, KeyBank, and Lake Shore Savings Bank.

| Name Of Financial Institution | Date Account Opened | Account No. [redacted] | Name of Account Holder | Initial Deposit |
|---|---|---|---|---|
| Edward Jones | June 16, 2008 | 702-*** | New Frontier Holdings One LLC | T-Bill of CW-1 |
| Edward Jones | September 13, 2008 | 370-*** | CW-1 | T-Bill value approx. $241,000 |
| Edward Jones | June 17, 2008 | 703*** | New Frontier Holdings Two LLC | Fannie Mae Bond, value $536,472 |
| Key Bank | October 16, 2008 | ***6994 | Phantom Holdings One LLC | $250 |

| Key Bank | November 25, 2008 | ***6812 | New Frontier Holdings LLC | $250 |
|---|---|---|---|---|
| Lake Shore Savings Bank | November 3, 2008 | ***0634 | New Frontier Holdings LLC | $100 |
| Lake Shore Savings Bank | December 3, 2008 | ***0682 | New Frontier Holdings Trust FBO, etc | $5,000,000 |
| Lake Shore Savings Bank LLC | March 3, 2009 | ***0818 | Phantom Holdings One LLC | $34,589 |
| Lake Shore Savings Bank LLC | March 25, 2009 | ***0906 | Carnic Services | $250,000 wire from Private Capital Holdings |

**Investment By CW-1**

12.   As a result of reviewing financial records of Michael
Wilson and some of the entities listed above in this affidavit, and
particularly the entities whose names are variants of "New
Frontier" and "Phantom Holdings," the FBI learned of a person from
the State of Illinois who had converted his retirement savings into
an asset worth approximately $241,000, and then transferred the
asset from Illinois to New York State to an account controlled by
Michael Wilson and companies Wilson controlled.  This person will

8

hereafter be referred to as CW-1.    The FBI, including the undersigned, has interviewed CW-1.

13.   On or about September 13, 2008, CW-1 and his spouse opened Edward Jones account number 370-*** in the State of Illinois.    On September 15, 2008, CW-1 executed a "Private Leveraging Agreement" with New Frontier Holdings One LLC, authorizing the transfer of a Treasury Bond in the amount of $241,000 to New Frontier.    The Private Leveraging Agreement provided that the market value of the transferred asset (the Treasury Bond) would be used to establish a line of credit. According to the Private Leveraging Agreement, payouts to CW-1 would be as follows:

**Day 1, 4% of the transferred asset would pay for fees**
**Day 20, 200% return to client (CW-1)**
**Day 40, 250% return to client (CW-1)**

An e-mailed copy of the signature page of the Private Leveraging Agreement reflects the signature of Michael Wilson, dated 10/01/2008.    According to the terms noted above, CW-1 believed that, pursuant to the Private Leveraging Agreement, he would pay 4% of $241,000 for fees up front on the first day, and then would receive about $480,000 twenty days thereafter and then, 20 days after that (40 days after the date of the agreement), CW-1 would receive another payout of more than $600,000 (*i.e.*, 250% of 241,000).

9

14.   On September 26, 2008, in furtherance of Wilson's scheme
to obtain this asset from CW-1, CW-1 was asked to transfer, and did
transfer, the $241,000 Treasury Bill from CW-1's Edward Jones
account in Illinois to the Edward Jones account of New Frontier
Holdings One, LLC.   The proceeds of this wire transfer were posted
to New Frontier's Edward Jones account maintained in the Western
District of New York.

15.   Through examination of bank records, the FBI learned that
on October 27, 2008, the aforementioned Treasury Bill was sold for
approximately $241,000. In furtherance of Michael Wilson's scheme
to defraud CW-1, the proceeds of the sale were wire transferred at
Wilson's request from the New Frontier Holdings One, LLC Edward
Jones account to an account at Key Bank controlled by Wilson in the
name of Phantom Holdings One LLC.   The Phantom Holdings Key Bank
account number was ***6994. Phantom Holdings was a company
controlled by Michael Wilson.   CW-1 never received any money as a
result of his investment, and months after Wilson sold CW-1's
Treasury Bill, CW-1 still was not aware that his Treasury Bill had
been sold.   Analysis of the Phantom Holdings account at Key Bank
shows that none of the funds deposited in it were used to invest
CW-1's asset.   Funds from this account, however, were used to
purchase a Land Rover for more than $101,000 on October 29, 2008.
Funds from the account also were used to fund an expenditure of

$10,500 at Nest Interiors on October 29, 2008, and to purchase a golf cart for $4,785 on October 27, 2008.

16.   CW-1 advised the FBI that he believed there was no risk in his $241,000 investment.   CW-1 said he transferred his $241,000 from his Edward Jones account to an Edward Jones account held by New Frontier Holdings One, LLC.   CW-1 said he received an email with an attached letter dated 11/05/2008, which was shortly after the first twenty-day trading period was supposed to have been completed.   The letter was from New Frontier, from a person purporting to be GEORGE POSSIODIS.   The email was received from an intermediary who was assisting CW-1 in the investment.   Also attached to the email was what purported to be a "screen shot" of an Edward Jones account.   A "screen shot" here refers to a view of a computer screen that purported to be a page of a New Frontier Edward Jones account statement.   CW-1 believed the screen shot reflected the profits he had earned as prescribed by the Private Leveraging Agreement he had signed with Wilson/New Frontier, after the first 20-day period.   The screen shot reflected an amount of $480,000.

17.   Your Affiant has conferred with an Anti-Money Laundering Risk Specialist from Edward Jones and has reviewed the pertinent financial records of Edward Jones.   This investigation confirms

11

that the aforementioned Edward Jones "screen shot" was not a legitimate Edward Jones document.  Further, CW-1 confirmed that he never has received any money from Wilson, New Frontier or anyone else in the form of payouts or profits.  Finally, CW-1 confirms that, despite many contacts and attempted contacts with personnel at New Frontier, and despite many telephone calls he has made to New Frontier, he never received any of his $241,000 investment back.

18.   The undersigned has confirmed that all wire transfers initiated by Edward Jones are sent through U.S. Bank from either Missouri or Minnesota.

### Investment of $250,000 By Private Capital Holdings LLC

19.   On or about March 26, 2009, Private Capital Holdings LLC ("Private Capital") entered into a Private Leased Buying Power Agreement pursuant to which Private Capital agreed to invest $250,000 with Carnic Services LLC.  The undersigned has reviewed this agreement and has interviewed the person who signed it on behalf of Private Capital.  This person advised the undersigned that he understood his investment would be used to obtain a credit line in the amount of approximately ten times the amount of the investment, i.e., $2.5 million.  This person further advised the undersigned that once the "credit line" was obtained, it would be

used, pursuant to another agreement with New Frontier, to obtain returns of about $11.2 million over a period of approximately 40 days.

20.    On or about March 27, 2009, in furtherance of the Wilson's scheme to obtain money from Private Capital, a wire transfer of $250,000 from Private Capital was made into Carnic Services' account number ***0906 at Lake Shore Savings Bank. According to the record of this wire transfer, the transferring bank was "US Bank Montana," and the receiving bank was "Lakeshore SL NY." Private Capital's address is a location in Helena, Montana. The $250,000 was credited to Carnic Services' account at Lake Shore Savings Bank in Hamburg, New York on March 27, 2009. This transaction was the opening deposit and the only deposit of funds into this account, which was maintained at Lake Shore's Hamburg, New York, branch. Thereafter, in the course of several transactions over a period from on or about March 27, 2009, until on or about April 25, 2009, all the funds except for $860 were withdrawn or transferred from this account. Approximately $176,000 of these funds were transferred into account number 0634 in the name of New Frontier Holdings LLC at Lake Shore Savings Bank. Despite having sent a certified letter to New Frontier in June or July of 2009 requesting the return of the $250,000, Private Capital received none of these funds back from New Frontier.

13

21.   On or about April 15, 2009, two checks made payable to "cash" were drawn on the aforementioned account number 0906 at Lake Shore Savings Bank and deposited into the aforementioned account number 0634 at Lake Shore Savings Bank.

22.   On about April 15, 2009, a check in the amount of $42,520.00 drawn on the account number 0634 and made payable to "Cash," was signed by an employee of New Frontier.  This check was used at Lake Shore Savings Bank to purchase a cashier's check in the amount of $41,000.00, payable to Superior Auto Sales.   This cashier's check was used for the purchase of a 2006 CHEVROLET CORVETTE, VIN: 1G1YY36U865114680. This vehicle was registered to David Smith, and is the subject of a forfeiture action brought by the United States in December, 2009.

23.   On or about July 1, 2009, Superior Auto Sales personnel advised that Michael Wilson came in to Superior Auto Sales and among other things, said he was interested in buying a car for a friend.   Wilson said he would purchase the Corvette for David Smith.  On or about April 15, 2009, a cashier's check in the amount of $41,000 (remitter New Frontier Holdings), and $541.00 in cash were dropped off at Superior Auto Sales for the purchase of the Corvette.   Superior Sales then proceeded with the delivery of the Corvette to Michael Wilson's property on Boston State Road.

24. When the undersigned interviewed Michael Wilson on July 1, 2009, Wilson said $250,000 had been received within two or three months prior to July 1, 2009 from a person named by Wilson , and whose identity has been confirmed by me during the investigation. Wilson said this money may have been deposited into an account of New Frontier Placements LLC at Northwest Savings Bank, or in an account in the name of Carnic at Lake Shore Savings Bank. (The investigation has confirmed that the money was deposited in the latter account.) Wilson also said that from June 2008 through July 1, 2009, New Frontier Corporation and its associated entities received approximately $4 million to $5 million pursuant to investment agreements.  Wilson advised that as of July 1, 2009, none of the agreements had come to fruition.  Wilson stated that he purchased several vehicles using money from his business accounts, including two Land Rovers, a Mercedes, and a Hummer, in addition to the Corvette.

**Investment of Funds From Commercial Escrow Services**

25. In or about April of 2010, Rosemary Wilson contacted Edward Jones and advised that she wanted to open an account in the name of Carnic Services LLC, dba Zodiac Capital, and that the purpose of the account was to hold "unpersonal assets."  This account was opened on April 21, 2010, with the account number ****-

2905.   The only authorized signer on the account is Rosemary Wilson.

26.   Until July 15, 2010, there was no activity in the account and its balance remained at zero.

27.   On July 16, 2010, the undersigned was advised by Edward Jones that there was significant activity involving an account in the name of Carnic Services dba Zodiac Capital.

28.   Edward Jones advised the undersigned that on July 15, 2010, $17,968.75 was wired from a Commercial Escrow Services Inc ("Commercial Escrow") account at Union Bank of Los Angeles to the aforementioned Edward Jones account in the name of Carnic Services LLC.   The FBI then made inquiries into public records and internal data bases, as a result of which the undersigned contacted a person (hereafter CW-2)   in Pleasant Hill, California who identified herself as the owner of Commercial Escrow.   CW-2 confirmed that the aforementioned $17,968.75 had in fact been wire transferred by Commercial Escrow to an account of Carnic Services LLC (Zodiac) maintained at the Edward Jones location in Williamsville, New York.

29.   CW-2 further advised the undersigned that the money wired to Zodiac was wired to Zodiac on the basis of representations that

it would be used to purchase an investment instrument that she
described as an MT-799.  CW-2 further understood that Zodiac was a
company that operated out of the Philippines, and that the
aforementioned $17,968.75 was only 25% of the amount her client was
to invest pursuant to its agreement with Zodiac.  CW-2 advised the
undersigned that one of the persons connected with Zodiac with whom
she communicated by e-mail was George Possiodis.  She further
advised that a woman who identified herself as an assistant to
George Possiodis told her that Mr. Possiodis would communicate only
by e-mail, and that she (CW-2) could not speak with him.  CW-2
further advised the undersigned that a person at Zodiac with whom
she communicated telephonically was "Will Wallace."

30.  The undersigned learned from Edward Jones personnel that
on July 14, 2010, Rosemary Wilson asked personnel at Edward Jones
if she could obtain a debit card for the Carnic account.  She also
asked whether there were any transaction limits using a debit card.
Edward Jones advised Ms. Wilson that it would take approximately
10-14 days for her to receive a debit card.  Also on July 14, 2010,
Rosemary Wilson advised that she expected a wire transfer into the
account.

31.  On July 15, 2010, Edward Jones received a confirmation
that a wire transfer of $17,968.75 from Commercial Escrow had been

17

received by Edward Jones for the benefit of the Carnic Services account maintained in Williamsville, New York.

32.    On July 16, 2010, the Edward Jones office in Williamsville, New York contacted Rosemary Wilson and advised her that a wire transfer had been received at Edward Jones for the benefit of Carnic Services.  Rosemary Wilson asked Edward Jones if, of the $17,968.75 that had been received at Edward Jones, the amount of $6,000 could be directed into her personal IRA account at Edward Jones.  Rosemary Wilson further requested that $10,953.75 be wire transferred to her personal bank account at HSBC, and that the remaining amount ($1,000, accounting for wire fees) was to remain in her Edward Jones Carnic Services account.  Later on July 16, 2010, Edward Jones notified Rosemary Wilson by voice mail that Ms. Wilson needed to sign authorization letters for the transfers to be completed.  Edward Jones mailed the letters to Ms. Wilson.

33.  On July 19, 2010, Rosemary Wilson called Edward Jones to inquire about the status of the aforementioned funds.  Edward Jones asked if she had received their voice mail message, and Ms. Wilson said she had not.  Ms. Wilson advised that she would come to Edward Jones and sign the authorization letters at the Edward Jones office located on Main Street in Williamsville, New York.

34.   Rosemary Wilson came to the Edward Jones office in Williamsville, New York on July 19, 2010, and signed the authorization letters approving the transfer of $10,953.75 to her personal account at HSBC.   Ms. Wilson advised Edward Jones personnel that she and her sons William and Michael were leaving that day - July 19, 2010 - for a vacation in Vancouver, British Columbia.   Rosemary Wilson advised Edward Jones that they needed this money for that vacation.   Ms. Wilson also advised Edward Jones that her son Michael was upset at her because she (Rosemary) wanted to wait until the money was available and that Michael wanted to leave immediately.

35.   Also during the conversation at the Edward Jones office on July 19, 2010, Rosemary Wilson advised that she did not want to transfer the $6,000 from her Edward Jones IRA account until after a further wire transfer of approximately $50,000 was received into the Carnic Services account.

36.   Later on July 19, 2010, the undersigned was advised by CW-2 that a person named "Will Wallace" had directed CW-2 to wire the balance of the investment of CW-2's client ($53,906.25) to the personal account of Rosemary Wilson at HSBC, not to the Carnic account at Edward Jones.   CW-2 said that, according to Wallace, Rosemary Wilson had purchased the MT-799 in advance with her own money.   CW-2 advised the undersigned that CW-2 balked at this

19

suggestion, because the HSBC account was not a Zodiac/Carnic account and therefore appeared not to be an authorized recipient of the funds.   CW-2 told the undersigned that CW-2 advised Mr. Wallace that she would require authority from a person CW-2 recognized as being authorized to change the wiring instructions.   CW-2 later advised the undersigned that she (CW-2) had received satisfactory evidence regarding her authority to wire the funds to the HSBC account of Rosemary Wilson, which CW-2 described as being contained in an e-mail from George Possiodis from the e-mail address ds981@live.com.   This e-mail address is the same as one of the e-mail addresses found to have been used by New Frontier (see paragraph 8, above).   The undersigned was advised by CW-2 that, she would therefore wire the funds.   The undersigned has learned that the funds in fact were wired to HSBC and received there.   It is respectfully submitted that the two wire transfers from Commercial Escrow to Carnic/Zodiac (on July 16, 2010) and Rosemary Wilson (on July 19, 2010), the latter transfer having been "authorized" in an e-mail received from "George Possiodis," were in furtherance of a scheme to defraud Commercial Escrow.

37.   The government made a request to Edward Jones that it freeze the funds in the $17,968.75 wire transfer on account of an ongoing fraud investigation.   Personnel from Edward Jones agreed to do this, but advised that Edward Jones would tell Rosemary Wilson

that the funds were frozen and the reason why.  The undersigned learned that Ms. Wilson was in fact advised of this.  It was after Rosemary Wilson was thus advised that CW-2 was directed by "Will Wallace" to wire the balance of the funds of CW-2's client (i.e. $53,906.25) to the HSBC personal account of Rosemary Wilson.

WHEREFORE, the undersigned respectfully asks that a criminal complaint be issued charging Michael Wilson with knowingly devising a scheme to defraud and to obtain money by false pretenses and representations, and using interstate wire communications in furtherance of that scheme.

                                                                         _____

ALLAN RAINS
Special Agent, Federal Bureau
Of Investigation

Sworn to me this 21/st
day of July, 2009.

_____
JEREMIAH J. McCARTHY.
United States Magistrate Judge

21